166 N.J. Super. 343 (1979)
399 A.2d 1027
STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
LEO KYLES, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued February 26, 1979.
Decided March 13, 1979.
*344 Before Judges CONFORD, PRESSLER and KING.
*345 Ms. Cynthia M. Jacob, designated counsel, argued the cause for appellant (Mr. Stanley C. Van Ness, Public Defender, attorney. Mr. Michael L. Perlin and Ms. Laura M. Lewinn, Deputy Director, Division of Mental Health Advocacy, on the brief).
Mr. Robert E. Rochford, Deputy Attorney General, argued the cause for respondent (Mr. John J. Degnan, Attorney General of New Jersey, attorney).
The opinion of the court was delivered by PRESSLER, J.A.D.
The essential question raised by this appeal is whether N.J.S.A. 2A:104-6, creating and defining the indictable offense of escape, applies to and hence renders criminally culpable an unauthorized departure from a psychiatric institution by a person involuntarily committed thereto. We are convinced that it does not and accordingly, on that ground alone, we reverse the judgment of conviction here appealed from.
Defendant Leo Kyles, according to the composite medical records, is middle-aged, moderately retarded, and suffers from chronic undifferentiated schizophrenia, organic brain syndrome, and the residual effects of both a seizure disorder and alcoholism. He has a criminal record dating back to 1963 consisting primarily of such disorderly persons offenses as loitering, vagrancy and drunk and disorderly conduct. He had first been involuntarily committed to Marlboro Psychiatric Hospital in 1962 and had been recommitted from time to time for varying durations thereafter.
In August 1974 defendant was indicted on a charge of atrocious assault and battery. His history of mental illness having been brought to the attention of the court, a hearing was held pursuant to N.J.S.A. 2A:163-2 for the purpose of determining his sanity at the time of the crime. The judge found that he was insane at that time and that his insanity continued. Accordingly, he entered an order dismissing the indictment and committing defendant to the New Jersey State Hospital at Trenton. That disposition preceded both the decision of the New Jersey Supreme Court in State v. *346 Krol, 68 N.J. 236 (1975), and the court's promulgation of the extensive amendments of R. 4:74-7 dealing with civil commitments. The effect, however, of Krol was to make clear defendant's consequent status as a civil committee with the right to periodic review of the commitment pursuant to R. 4:74-7(f). Periodic reviews were in fact held, and as a result of the second such hearing defendant was, in December 1976, ordered immediately transferred to Marlboro Psychiatric Hospital.
Several months after defendant's transfer to Marlboro, in February 1977, he left the hospital premises to buy cigarettes and liquor and was apprehended while on his way to a nearby shopping center by hospital police who, although they apparently returned him to the institution, nevertheless filed a complaint charging him with escape pursuant to N.J.S.A. 2A:104-6. Two weeks later, however, he had yet another routine review hearing which resulted in an order, entered on March 1, 1977, continuing his involuntary commitment at Marlboro. The same judge who entered that order entered a superseding order on March 15, 1977 on the basis of the criminal complaint and the detainer then filed with respect thereto. That superseding order discharged defendant from the involuntary commitment and remanded him to the Monmouth County Correctional Institution.[1] On *347 April 6, 1977 an accusation was filed charging defendant with escape, and two weeks later, represented by a deputy assistant public defender, he waived indictment and trial by jury and pleaded guilty. He was sentenced to a term of 1-3 years in State Prison. We have been advised that he has since been transferred to the New Jersey State Hospital in Trenton.
Appellate counsel asserts a variety of challenges to the conviction, none of which were raised below, including the claim that the accusation failed to charge an offense. Such a claim is cognizable on appeal even if not raised at trial. R. 3:10-3. Accordingly, we have considered that issue and we decide it in defendant's favor since we are convinced that the escape statute was egregiously misapplied in this case and that the Legislature did not intend criminal culpability to attach to the wanderings of involuntarily committed persons suffering from mental illness.
The statute, N.J.S.A. 2A:104-6, encaptioned "Prisoners escaping or attempting to escape," reads in full as follows:
Any person imprisoned or detained in a place of confinement, or being in the lawful custody or control of a penal or correctional institution or of an officer or other person, upon any charge, indictment, conviction or sentence for any crime, or upon any writ or process in a civil action or proceeding, or to await extradition, who by force or fraud escapes or attempts to escape from such place of confinement or from such custody or control, or leaves the building or grounds of his place of confinement without the consent of the officer in charge, is guilty of a misdemeanor.
We are in complete accord with defendant's contention that this statute on its face does not apply to a person involuntarily committed by reason of mental illness since neither the place of his confinement nor the reason therefor is within the statutory definition or intendment.
The statutory offense is defined as the escape or attempt to escape from a place of confinement or from an officer's custody by a person whose confinement or custody is based upon either 1) a charge, indictment, conviction or *348 sentence for any crime, or 2) a writ or process in a civil action or 3) to await extradition. Mere confinement in a psychiatric hospital based on an involuntary civil commitment order obviously falls outside these three categories of confinement. The extradition category is, of course, wholly inapplicable. It is equally clear that a civil commitment order does not result in a confinement based on a charge, indictment, conviction or sentence for crime. This is patently so even in the case of persons charged with crime where the charge is dismissed or the person acquitted by reason of insanity. As Justice Pashman made clear in State v. Krol, supra:
Commitment following acquittal by reason of insanity is not intended to be punitive, for, although such a verdict implies a finding that defendant has committed the actus reus, it also constitutes a finding that he did so without a criminal state of mind. There is, in effect, no crime to punish. * * * The rationale for involuntarily committing such persons pursuant to N.J.S.A. 2A:163-3 is, rather, to protect society against individuals who, through no culpable fault of their own, pose a threat to public safety. [68 N.J. at 246]
The State places its primary reliance on the third alternative, claiming that a civil commitment order constitutes "a writ or process in a civil action or proceeding." We are constrained to disagree. The historical concept of "writ or process" connotes a judicial command whereby the court obtains jurisdiction over a party or res, initially or mesne, so as to enable it to make an ultimate adjudication on the merits. Thus the writ or process is, classically, the jurisdictional predicate of the adjudicatory function; it is not the order or judgment emanating from the exercise of that function which declares the ultimate rights and obligations of the litigants. See, generally, Stevens v. Associated Mortgage Co., 107 N.J. Eq. 297, 299 (Ch. 1930). See also, Schnitzer & Wildstein, 2 N.J. Rules Service at AIV-29. And see Black's Law Dictionary (4 ed. rev.), at 1783, defining "writ" as a sealed writing issued by the court and functioning "either as the commencement of a suit or other *349 proceeding or as incidental to its progress." The "writ or process" language is, moreover, even more discretely defined by the statute. It is not any writ or process in a civil proceeding to which it refers, but rather a writ or process pursuant to which a person has been "imprisoned or detained in a place of confinement" or has been placed "in the lawful custody or control of a penal or correctional institution or of an officer or other person." Application of the principle of ejusdem generis to such unqualified terms in this definition as "detained," "officer" and "other person" leaves no doubt that the circumstance the statute speaks to is incarceration or custody by way of civil arrest resulting, illustratively, from the issuance of a writ of capias or ne exeat. The concept and function of civil arrest, comprehensively analyzed by the Supreme Court in Perlmutter v. De Rowe, 58 N.J. 5 (1971), is essentially coercive, intended to insure both defendant's appearance and his ultimate compliance with orders and judgments entered in favor of another party. A civil commitment order, intended to ensure the protective custody and appropriate medical care of a mentally ill person, is neither definitionally or functionally a civil arrest or in the nature of a civil arrest.
We believe that our construction of the escape statute is consistent with legislative intent. We perceive nothing in the language or policy of the statute which would impose susceptibility to criminal consequence and exposure to the criminal process upon a person confined by court order in a psychiatric facility and who, in the psychiatric parlance, "elopes" therefrom. Indeed, the impulse for unauthorized departure may be presumptively viewed as at least partially attributable to the psychiatric symptomatology which caused the commitment in the first place. See State in the Interest of M.S., 73 N.J. 238 (1977), rejecting on similar analysis the contention that an unauthorized departure by a juvenile from a JINS shelter constitutes conduct within the definitional scope of the escape statute.
*350 We also conclude, contrary to the State's contention, that our reading of N.J.S.A. 2A:104-6 is consistent with the analogous provision of the New Jersey Code of Criminal Justice, N.J.S.A. 2C:29-5. That statute speaks in terms of removing oneself without lawful authority from "official detention." Official detention, in turn, is defined as either arrest; detention in a facility for custody of persons under charge or conviction of crime or who have been alleged or found to be delinquent; detention for extradition or deportation; or other detention for law enforcement purposes. The State contends that a civil commitment is a detention for law enforcement purposes. It is true that a civil commitment order is based upon the finding that the committee is, by reason of his mental illness, dangerous to himself or others. See R. 4:74-7(f). Such dangerousness is the basis of both the societal interest and the societal authority for the involuntary commitment. But it would be an unwarranted extension of the ordinary meaning of "law enforcement" and a derogation of the medical basis of the confinement to classify an involuntary commitment as a detention for law enforcement purposes. Cf. State v. Krol, supra 68 N.J. at 257-258, acknowledging that while the commitment order "should be molded so as to protect society's very strong interest in public safety," the ultimate and overrriding consideration is that the order must do so "in a fashion that reasonably minimizes infringements upon defendant's liberty and autonomy and gives him the best opportunity to receive appropriate care and treatment."
Finally, the State seeks support for its position in the commentary on N.J.S.A. 2C:29-5, see 2 Final Report of the New Jersey Law Revision Commission, at 287 (1978), which states that
New Jersey's present laws and the Code agree in defining official detention more broadly than merely institutions for detaining persons charged with or convicted of crime. The breadth of the institutional coverage is desirable in view of the diversity of institutional facilities employed in modern penology. At the same time care must *351 be exercised to avoid making it criminal for a person to depart from an institution which he has voluntarily entered for psychiatric or other treatment, although his entry may for some purposes be described as a "commitment."
The State's argument, overlooking the penological thrust of the commentary, is that the reference to voluntary commitment only should be read as an intent to include involuntary civil committees within the scope of the statute. We are, however, satisfied that the reference to voluntary commitments alone bespeaks nothing more than a failure of consideration of the status of involuntary committees, an omission of little consequence in our view in light of the subsequest jurisprudential advance in respect of that subject represented by State v. Krol, supra, the 1975 amendment of R. 4:74-7, and the 1975 enactment of N.J.S.A. 30:4-24.1 and 24.2, declaring and protecting the rights of the mentally ill. Cf. Camburn v. Marlboro Psychiatric Hosp., 162 N.J. Super. 323 (App. Div. 1978).
The judgment of conviction is reversed.
NOTES
[1] The record is not clear as to whether that order was entered sua sponte or on application by the prosecutor, hospital or other interested person. In any event, we perceive nothing in the applicable statutory scheme which would mandate termination of an involuntary civil commitment and transfer of the committee to a penal institution merely because the committee has been charged with a crime and a detainer therefor lodged against him with the psychiatric facility. Indeed, we would regard such a transfer, and particularly a predispositional transfer, as presumptively contraindicated since in view of the adjudicated mental condition of the committee, his confinement in a penal institution among a penal institution's general population is obviously inappropriate. We would further note that it is not unusual for involuntary committees confined to a mental hospital to be burdened by detainers lodged against them. The purpose of such detainers is to insure their ultimate availability to the criminal process, not to terminate the commitment.